# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# DOCKET NO. 3:08CR192-R

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **MEMORANDUM AND RECOMMENDATION** |
| ) | **AND ORDER** |
| **GRADY LEE RUSHING,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's "Motion to Suppress Evidence" filed January 22, 2009 (document #18). The "United States's Response To Motion to Suppress" (document #22) was filed January 27, 2009. On February 18, 2009 the undersigned conducted an evidentiary hearing on the subject motion, which is therefore now ripe for resolution.

Having carefully considered the applicable authority, the written record, the testimony, and the arguments of counsel, the undersigned will respectfully recommend that the Defendant's Motion be **DENIED**.

## I. FACTUAL BACKGROUND AND FINDINGS

The events giving rise to the subject Motion occurred primarily on July 7, 2007, beginning with surveillance conducted by Charlotte-Mecklenburg Police Officer S.A. Selogy. Specifically, beginning at approximately 10:30 a.m., Officer Selogy was in an unmarked vehicle at locations near Little Rock Apartments and Boulevard Homes, two complexes well known for drug and other criminal activity.

Officer Selogy elected to conduct his surveillance in the morning for two reasons. First, there had recently been substantial police activity at the two complexes in the evening, resulting in

numerous arrests, which his training and experience led him to believe would cause those engaging in drug activity in the area to shift their transactions from evenings to the daytime. Second, the police received information that this had, in fact, occurred once it became known that these locations were "hot" (targeted by police for stepped-up enforcement).

While conducting surveillance, Officer Selogy observed a black Ford vehicle pull into a parking lot which was itself a location well known (he described it as "notorious") for drug use and distribution. Officer Selogy recognized the driver as the Defendant, Grady Lee Rushing, an individual known by law enforcement as one who had been arrested for engaging in criminal conduct in the vicinity. Shortly after the Defendant pulled into the parking lot Officer Selogy observed an unidentified black male run up to the driver's door at which point the Defendant handed him an object "about the size of a pebble." Officer Selogy observed the unidentified male examining the object, which Officer Selogy believed to be illegal drugs of some sort, looking around in a manner which the officer interpreted as indicating nervousness, and then walking rapidly away. Based on his training and experience – which includes 17-years in drug-related law enforcement and thousands of drug arrests – Officer Selogy believed he had just observed an illegal drug transaction.

After this exchange Officer Selogy observed the Defendant driving to three other locations, each also known for drug use and distribution, within a period of just a few minutes. During this brief period, the Defendant was also observed exiting the vehicle and walking to a breezeway in one of the complexes, another location known by local police as a rendezvous spot used by drug dealers to distribute their wares.

At some point Officer Selogy was able to observe the license plate on the vehicle the Defendant was driving (using binoculars from his surveillance location), and he determined that it

was a rental vehicle. Officer Selogy testified that he knew from his training and experience that drug dealers frequently used rental vehicles to transport and distribute drugs.

Although defense counsel emphasized at the evidentiary hearing what Officer Selogy did not see – namely, any money changing hands – Officers Selogy and Brent Koeck both testified at the evidentiary hearing that drug distribution without simultaneous payment is increasingly common. Officer Selogy testified that he had observed this change beginning in around 2000-01, and that in 2008 approximately 50% of the drug transactions he investigated did not involve simultaneous payment.

Having observed what he believed to be a hand-to-hand drug transaction, Officer Selogy radioed two Charlotte-Mecklenburg Police Officers standing by for possible "take down" to "make contact" with the Defendant. The Officers, Brent Koeck and Patrick Hairston, understood "make contact" to mean make an arrest.

When the Officers approached the vehicle, Officer Koeck opened the driver's door, "grabbed" the Defendant, and pulled him out of the car. Shortly thereafter, Officer Koeck observed what he believed, based on his training and experience, to be a baggie containing crack cocaine. Within seconds of the Defendant's removal from the vehicle, Officer Hairston found a baggie containing "rocks" under the Defendant's foot. These rocks have since been sent to the lab and found to be 7.14 grams of crack cocaine.

## II. CONCLUSIONS OF LAW

### A. Probable Cause/Warrantless Arrests

Warrantless arrests are permitted where there is probable cause to believe a felony is being or has been committed by the arrested individual, based upon "the totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 230-31 (1983). Accord United States v. Watson, 423 U.S. 411, 424 (1976) (warrantless arrest permitted if officer has probable cause to believe felony has been committed, even if committed outside officer's presence); United States v. Collins, 412 F.3d 515, 518 (4th Cir. 2005); United States v. Dickey-Bey, 393 F.3d 449, 453-56 (4th Cir. 2004); United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004); and United States v. McCraw, 920 F.2d 224, 227 (4th Cir. 1990).

As the Supreme Court famously put it in Illinois v. Gates, 462 U.S. at 232, "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."

The Fourth Circuit has explained the probable cause standard as "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984). See also Maryland v. Pringle, 540 U.S. at 370 (describing probable cause as "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life"); United States v. Cortez, 449 U.S. 411, 418 (1981) (advocating a "common sense" approach); Dickey-Bey, 393 F.3d at 453-54 (citing and discussing Supreme Court and Fourth Circuit authority); and United States v. Gray, 137 F.3d 765, 769-70 (4th Cir.) (en banc) (describing probable cause as

4

"an objective standard of probability that reasonable and prudent persons apply in everyday life"), cert. denied, 525 U.S. 866 (1998).

As noted above, whether there is probable cause to arrest depends on the totality of the circumstances. Maryland v. Pringle, 540 U.S. at 370-71; United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004). In assessing the totality of the circumstances, the potentially relevant factors are numerous and widely varied, including: "[a]n officer's practical experience and the inferences the officer may draw from that experience; [whether the suspect activity is in] a high crime area; . . . [and] even 'seemingly innocent activity' when placed in context of surrounding circumstances." Id. (internal citations omitted).

### B. Reasonable Suspicion/Investigative Stops

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 544 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). Accord Arvizu, 544 U.S. at 273 (permitting "officers to draw

5

on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotation omitted).

Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. See, e.g., United States v. McCoy, 513 F.3d 405, 412-13 (4th Cir.), cert. denied, 128 S. Ct. 2492 (2008) (experienced officer's observation of vehicles park briefly in store parking lot where drug sales had previously occurred, then move to another nearby lot where drug sales had also occurred and where occupant of one vehicle got into the other vehicle for a short time, after which that vehicle left at a high rate of speed as officer approached, sufficient to constitutes reasonable suspicion); United States v. Harris, 39 F.3d 1262, 1268-69 (4th Cir. 1994) (officer's observation of man leaving apartment in a vehicle after confidential informant advised drug delivery was imminent constitutes reasonable suspicion to stop vehicle); United States v. Turner, 933 F.2d 240, 242-44 (4th Cir. 1991) (officer with experience in narcotics investigations had reasonable suspicion to stop and determine whether subject was "cooking" illegal drugs after observing her carry cup of water out of convenience store, walk to car, and lean over front seat as if to hide something); and United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (officer's nighttime observation of man walking away from otherwise deserted area where burglar alarm had just gone off constitutes reasonable suspicion to stop man).

Many factors have been approved as properly contributing to "reasonable suspicion." Among them: (1) presence in a high crime area, United States v. Black, 525 F.3d 359, 365 (4th Cir.), cert. denied, 129 S. Ct. 182 (2008); Perkins, 363 F.3d at 320-21; United States v. Christmas, 222 F.3d 141 (4th Cir. 2000), cert. denied, 531 U.S. 1098 (2001); Lender, 985 F.2d at 154; Moore, 817 F.2d at 1107; (2) observation by law enforcement of what appears to be a drug transaction or other criminal conduct based

on their experience, Terry v. Ohio, 392 U.S. at 22-23; Adams v. Williams, 407 U.S. 143, 145 (1972) (even though officers could not see drugs, officers were not required in the absence of probable cause to "shrug [their] shoulders and allow a crime to occur"); Moore, 817 F.2d at 1107; Lender, 985 F.2d at 154; and (3) "furtive behavior," United States v. Sims, 296 F.3d 284, 285-87 (4th Cir. 2002).

Being in a "high crime area," standing alone, is not enough to constitute "reasonable suspicion." Illinois v. Wardlow, 528 U.S. at 124. However, it clearly is a relevant factor to be considered in the overall calculus. Id. Accord Black, 525 F.3d at 365-66 (being in high crime area combined with other enumerated factors constituted "reasonable suspicion" to detain and frisk defendant); United States v. Mayo, 361 F.3d 802, 804-07 (4th Cir. 2004) (being in high crime area, combined with suspicious, evasive, and nervous conduct constituted "reasonable suspicion" and justified frisk for officer's protection); and Christmas, 222 F.3d at 145 ("although [the defendant's] presence in a high crime area is not alone sufficient to justify a Terry stop, the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a Terry analysis").

Whether a suspect is in investigative detention or has been arrested is determined by an objective standard, namely, whether "the suspect's freedom of action [has been] curtailed to a degree associated with formal arrest." United States v. Elston, 479 F.3d 314, 319 (4th Cir. 2007), quoting Park v. Shifflett, 250 F.3d 843, 850 (4th Cir. 2001). Thus, the subjective views of an officer or agent, or of a suspect, as to whether he or she was under arrest "has no bearing" on the relevant inquiry. Id. at 319, citing Stansbury v. California, 511 U.S. 318, 323 (1994) (observing that "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"); and Park v. Shiflett, 250 F.3d at 850.

Neither a suspect's feeling about whether he or she was "free to leave," nor whether the suspect was, in fact, free to leave, is determinative as to whether an individual was in investigative detention or under arrest at any particular time. See, e.g., Elston, 479 F.3d at 319-20 (suspect who had been removed from vehicle at gunpoint and handcuffed, and who was not free to leave at the time vehicle was searched, was nevertheless still in investigative detention and not yet under arrest); Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest"); and Moore, 817 F.2d at 1108.

In other words, in evaluating whether an initial stop constitutes a Terry stop or an arrest, a show of force does not necessarily connote arrest. See, e.g., Elston, 479 F.3d at 320 (drawing firearm and handcuffing suspect did not convert investigative stop into arrest); United States v. Sinclair, 983 F.2d 598, 603 (4th Cir. 1993) (use of drawn weapons to detain subjects did not convert investigative stop into arrest); United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989) (brief handcuffing of suspect necessary to maintain status quo and protect officer did not convert Terry stop into arrest); and United States v. Manbeck, 744 F.2d 360, 370 (4th Cir. 1984) (calling drawn weapons a "justified safety precaution" in a Terry stop).

### III. DISCUSSION

Although defense counsel should not be faulted for trying, this is not a close case. Simply put, (1) there was probable cause to arrest the Defendant based solely on Officer Selogy's observation; and (2) even if what Officer Selogy observed only constituted "reasonable suspicion," a point the Defendant concedes, grabbing and removing the Defendant from the car is certainly no

8

more intrusive than drawing a weapon and ordering a subject to exit a vehicle, an act the Fourth Circuit has squarely held does not *ipso facto* convert an investigative stop into an arrest. Further, whether the facts are regarded as probable cause justifying arrest or reasonable suspicion justifying an investigative stop, once the crack cocaine was discovered, there was clearly probable cause to make an arrest.

As noted in the preceding section, "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts . . . ." Gates, 462 U.S. at 232. As the Government correctly argues, whether there is probable cause depends on "the totality of the circumstances," Pringle, 540 U.S. at 370-71, considering "the factual and practical considerations of everyday life." Cortez, 449 U.S. at 418 (advocating a "common sense" approach). Moreover, among the prescribed factors "[a]n officer's practical experience and the inferences the officer may draw from that experience," Pringle, 540 U.S. at 370-71, is more important than most.

Taking the prescribed common sense approach to the totality of the circumstances observed by Officer Selogy on July 7, 2007, it is clear that there was probable cause to believe he had observed the Defendant engage in a hand-to-hand drug transaction. A seasoned drug investigator with seventeen years experience (twenty in law enforcement), Officer Selogy was well aware that he was in an area which was "notorious" for drug dealing. He knew specifically that the parking lots and breezeway in which he observed the Defendant on July 7, 2007 were frequently used by drug users and dealers, and that many arrests had occurred in these specific locations and at other locations in the Little Rock Apartments and Boulevard Homes complexes. He also recognized the Defendant as the driver, and knew that the Defendant was known by law enforcement to engage in criminal conduct in and around these complexes.

9

With this background knowledge of the places and person, Officer Selogy observed what even a lay person would believe was probably an illegal hand-to-hand drug transaction. Of course this does not mean that the Defendant's scuttling between four known drug distribution points within a brief period could not <u>possibly</u> have an innocent explanation – he could, perhaps, have been searching for box turtles for a favorite nephew and what he handed the unidentified male who ran to his car could possibly have been a carefully folded gospel tract or a breath mint. But probable cause, by definition, addresses not possibilities but probabilities.

Crediting the practical experience of Officer Selogy, as we must, what he observed was a man known by law enforcement to have engaged in criminal conduct in that very area travel to four known drug distribution spots in rapid succession, in a rental car; at one of those locations he observed the Defendant hand an object which appeared to be the size of a small pebble to a man who himself acted suspiciously during the encounter. Neither the fact that Officer Selogy could not positively identify the item that the Defendant distributed as drugs nor the absence of a simultaneous passage of money defeats the otherwise inexorable conclusion, namely, that Officer Selogy reasonably believed that he had <u>probably</u> just observed a hand-to-hand drug transaction.

Although the undersigned concludes that there was probable cause to arrest the Defendant on July 7, 2007, as noted <u>supra</u>, even the Defendant concedes that there was "reasonable suspicion" sufficient to justify an investigative stop. Defense counsel's argument that grabbing the Defendant and bodily removing him from the car exceeded what is permitted in an investigative stop notwithstanding, it is difficult to see how the police response in this case should be condemned in light of the approval of the drawing of weapons and handcuffing of subjects <u>prior to arrest</u> in other cases. Indeed, suspecting that the Defendant had just engaged in a hand-to-hand drug transaction,

10

and given the well-known practice of drug dealers carrying firearms, safety considerations certainly called for a more aggressive approach in this kind of investigation than in the investigation of suspected crimes which are less associated with firearms and violence.  Accord United States v. Ward, 171 F.3d 188, 195 (4th Cir.) (firearms are well-recognized "tools of the trade" in the illegal drug business), cert. denied, 528 U.S. 855 (1999); United States v. Kennedy, 32 F.3d 876, 882-83 (4th Cir. 1994) (same); United States v. Hinds, 856 F.2d 438, 443 (4th Cir. 1988) (same); and United States v. Brockington, 849 F.2d 872, 876 (4th Cir. 1988) (same).

In conclusion the undersigned finds that there was probable cause to arrest the Defendant on July 7, 2007 based solely on Officer Selogy's background knowledge and observations; that even if probable cause was lacking, the police acted reasonably in grabbing and bodily removing the Defendant from his rental vehicle on that date; and in any event, that there clearly was probable cause to arrest the Defendant once the crack cocaine was discovered and seized.

## IV.  RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the Defendant's "Motion To Suppress Evidence" be **DENIED**.

## V.  NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same.  Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003);  Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990).  Failure to file objections to this Memorandum with

the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum And Recommendation And Order to counsel for the parties; and to the Honorable Martin K. Reidinger.

**SO ORDERED AND RECOMMENDED.**

Signed: February 19, 2009

_____
Carl Horn, III
United States Magistrate Judge